In the

# United States District Court
# for the District of Maryland

## Case No.: 1:14-cv-02152-WDQ

### Jerome Dale

*Plaintiff*

vs.

## Mayor & City Council of Baltimore, *et al.*

*Defendants*

## Plaintiff's Opposition to
## Defendant's Motion to Dismiss

***Charles H. Edwards IV***
1010 Light Street
Baltimore, Maryland 21230
P: (410) 547-8568
F: (410) 547-0036
*charles.edwards@robinhoodlawyers.com*
*Attorney for Plaintiff*

**INTENTIONALLY BLANK**

Now comes the Plaintiff, Jerome Dale, by and through his attorneys, Charles H. Edwards IV and The Law Office of Barry R. Glazer, P.C., and files this Opposition to the Defendant's Motion to Dismiss, for the reasons set forth below, and more fully in the accompanying Memorandum of Law:

1.      Pursuant to Federal Rule of Civil Procedure 8(a), the Plaintiff has provided a short and plain statement of his claims that indisputably demonstrate that he is entitled to relief in accordance with the simplified notice pleading standard, *inter alia, as* set forth in *Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit*;[1]

2.      The Plaintiff's factual allegations must be accepted as true and are entitled to all favorable inferences which can be drawn therefrom, relying on liberal discovery rules and summary judgment motions to further define facts and issues present in this action and dispose of any unmeritorious claims later in the litigation process;

3.      The dismissal of the Plaintiff's claims would be premature in that discovery has not yet been conducted and additional information may come into the Plaintiff's possession which would bear on the issues raised by the Defendant;

4.       To the extent that it can be argued that this case presents a theory of liability against the Defendant that has not been fully tested; pursuant to the well-settled applicable jurisprudence, any testing should be forestalled until after there has been sufficient development of the record and not be conducted on the pleadings;[2] and

5.      When the Plaintiff's factual allegations are accepted as true and the Defendant's Motion to Dismiss is evaluated with all inferences construed in the Plaintiff's favor, bearing in mind that this action is still in its infancy; for reasons set forth more fully in the Plaintiff's accompanying Memorandum of Law in Support of the Plaintiff's Opposition to the Defendant's Motion to Dismiss, judgment in the Defendant's favor is precluded.

**WHEREFORE**, the Plaintiff, Jerome Dale, respectfully requests that the Defendant's Motion to Dismiss be denied in its entirety.

---

[1] 507 U.S. 163, 113 S.Ct. 1160 (1993).
[2] *Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985); *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004)

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, P.C.**

*Charles H. Edwards IV*

_____

Charles H. Edwards IV
Law Offices of Barry R. Glazer
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
(410) 547-8568
Bar Roll No.: 29977
*Attorney for the Plaintiff*

In the

# United States District Court

# for the District of Maryland

### Case No.: 1:14-cv-02152-WDQ

## Jerome Dale

*Plaintiff*

vs.

## Mayor & City Council of Baltimore, *et al.*

*Defendants*

## Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss

**INTENTIONALLY BLANK**

### PRELIMINARY STATEMENT

Governor Martin O'Malley initially gained public notoriety in Maryland after accusing former Mayor of Baltimore City (*hereinafter,* the "Mayor"), Kirt Schmoke, of "cooking" the accounting of crime-reduction rates in the mid-1990s.[3] At the same time, then-Mayor of New York City, Rudolph Giuliani, was reporting that under his two-year reign, starting in 1994, New York City's serious crime rate had decreased by 40%.[4] Disturbingly, even assuming that Mayor Giuliani's outrageous figures were not cooked themselves, it cannot be escaped that numerous studies were conducted at the time that concluded that Mayor Giuliani's policing disturbingly "departed from [its] original Broken Windows under pinnings, and more closely resemble[d] policing poor people in poor places."[5] More disturbing still, according to the New York State Attorney General, 23% of the stops reported by the New York City Street Crime Unit lacked reasonable suspicion.[6] And that 23% did not take into account stops that were never reported or stops where police misconduct was involved with the charging documentation.

In August of 1996, while serving on the Baltimore City Council, Governor O'Malley went on a "fact finding mission" to Mayor Giuliani's New York City, later noting about his trip that "while Baltimore [City's] murders had increased, New York [City] had gained national recognition for reducing serious crime by as much as 40% - just two years after [changing] its enforcement priorities to quality of life policing."[7] Thereafter, Governor O'Malley regularly criticized Mayor Schomoke for not implementing a New York City style of policing.[8] A sampling of Governor O'Malley's criticisms of Mayor Schomoke's exercises of control over the Baltimore City Police Department (*hereinafter*, the "BCPD") and Baltimore City police officers (*hereinafter*, the "Police Officers"), Governor O'Malley's campaign promises to ensure  compliance with his policy changes within the BCPD and the State's Attorney's Office, and the actions Governor O'Malley took to bring his policies into fruition after he became Mayor are discussed herein to demonstrate the incredible gulf between the power the Mayor wields over the BCPD and the Police Officers and the holding in *Anderson v. Strohman*.[9] Also, as discussed hereinafter in the body of this Memorandum of Law, *Anderson* has seriously confused what is being redressed in a successful *Monell* claim and correspondingly which employees' conduct is at issue.

---

[3] Van Smith, *Martin O'Malley's Failed Promise As Baltimore Mayor Will Stay With Him, No Matter Who Wins The Governor's* Race, Balt. City Paper, http://www2.citypaper.com/news/story.asp?id=12855 (last visited April 17, 2011).

[4] Martin O'Malley, WITH CHANGE THERE IS HOPE: *A Blueprint for Baltimore's Future*, 7 (1999).

[5] Jeffrey Fagan & Garth Davies, *Street Stops and Broken Windows: Terry, Race, and Disorder in New York City*, 28 Fordham Urb. L.J. 457, 496 (2000).

[6] Andy Newman, *Ruling in Street Crime Unit Case Could Expand List of Plaintiffs*, N.Y. Times, Jan. 26, 2001, at B6.

[7] *Id.*

[8] Ralph Taylor, *Breaking Away from Broken Windows: Baltimore Neighborhoods and the Fight Against Crime, Grime, Fear, and Decline*, 93 (2001).

[9] 6 F.Supp.3d 639 (D.Md. 2014).

In a speech on June 23, 1999, Governor O'Malley announced his campaign to become Mayor on the street corner of a high crime neighborhood, stating "My name is Martin O'Malley. I believe I can turn Baltimore City around by making it a safer place…"[10] In that same speech, Governor O'Malley promised to make the "open-air drug market" he was standing in and nine others like it "things of our City's past" within six months of being elected and by his second term in office, twenty more.[11]

As part of his campaign, Governor O'Malley authored a booklet made up of two parts – one bound with a green cover and the other bound with a blue cover – titled *With Change There is Hope: A Blueprint for Baltimore's Future*. In the introduction to the green booklet, Governor O'Malley stated that "it is time for a new mayor to change the way we police and reform the way our criminal justice system operates."[12] His stated solution, based on what he had learned from his study of Mayor Giuliani's policing in New York City involved curing "Broken Windows Syndrome."[13]

Governor O'Malley explained in his booklet that:

> Social psychologists and police officers tend to agree that if a window in a building is broken and left unrepaired, all the rest of the windows will soon be broken…one unrepaired window is a signal that no one cares, and so breaking more windows costs nothing.[14]
> . . . .
> **As Mayor I will actively lead these efforts and use the power of the office to bring about long overdue reforms.**[15]

Governor O'Malley proposed five reforms to "improve the quality of life in our City:" 1) streamlining the booking and charging process; 2) expanding citation authority; 3) creating an arraignment court at Central Booking; 4) utilizing CompStat; and 5) using existing mandatory penalties to prosecute repeat violent offenders.[16]

> While the City Council has had the power to spotlight these issues and make these recommendations, **only the Mayor of Baltimore has the power to actually order the change in enforcement priorities and thereby force reforms on a reluctant system.**[17]

---

[10] *WITH CHANGE THERE IS HOPE, supra,* at 3.
[11] *Id.*
[12] *Id.* at 5.
[13] *Id.* at 6-7.
[14] *Id.* at 8.
[15] *Id.* at 12 (emphasis added).
[16] *Id.* at 15.
[17] *Id.* (emphasis added).

Governor O'Malley elaborated on his plans, stating that "as Mayor, I will secure the support necessary to give our officers the flexibility they need…or I will have the City Council enact local ordinances."[18] He further elaborated that he would "increase funding for the State's Attorney's Office as long as it stays committed to the path of reform…"[19]

Governor O'Malley correctly noted that "there is nothing more harmful to law enforcement, and more devastating to the morale of law abiding citizens and law enforcement officers, than police misconduct."[20] Referring to the system of policing he planned to implement if elected, Governor O'Malley cautioned "from examples in other cities," that "when the police are encouraged to be more assertive, government must become more assertive and open in its policing of the police."[21] "[A]fter all," he stated, "[they] are only human."[22]

The logical check or balance, as the case may be, on law enforcement is a citizen review board. To that end, Governor O'Malley stated that:

> A citizen review board will only have power *if* the Mayor of this City truly wants to root out police corruption and misconduct…we must open the Police Department's internal investigation process, to assure the public that police problems are not being swept under the rug...[23]

Governor O'Malley was elected Mayor in 1999 and took office on December 7th of that year. Immediately, he took steps to implement policing policies that had been tried and tested in other cities and found to be unconstitutional, as well as disproportionally targeted at minorities and the poor. His steps included firing the BCPD's Police Commissioner (*hereinafter*, the "P.C.") from the former administration within 57 days of taking office for disagreeing with him about the value of zero-tolerance policing. In the outgoing P.C.'s place, Governor O'Malley hired Ed Norris, a 20-year veteran of the New York City Police Department, who had experience implementing Mayor Giuliani's New York City policing policies. Additionally, Governor O'Malley hired Jack Maple, who had been credited with being the brains behind New York City's CompStat program and instrumental in New York City's efforts to implement broken-windows policing.[24] Leveraging Ed Norris and Jack Maple, Governor O'Malley's police department implemented its own CompStat program to track emerging criminal patterns geographically, as well as charting officer performance, police brutality, corruption, and misconduct.[25]

---

[18] *Id.* at 17 (emphasis added).
[19] *Id.*
[20] *Id.* at 22.
[21] *Id.* at 11 (emphasis added).
[22] *Id.* at 22 (emphasis added).
[23] *Id.* at 22 (emphasis added).
[24] Peter Herman, *Police Hire N.Y. Officer as Deputy*, Balt. Sun, Jan. 10, 2000, at 1A.
[25] Del Quentin Wilber, *Police Official Quits, Attacks Use of Crime Database*, Balt. Sun, Dec. 5, 2003, at 1B; Gerald Shields, *City Figures to Improve Efficiency*, Balt. Sun, Nov. 19, 2000, at 1B.

Armed with the brains behind Mayor Giuliani's policing policies and procedures, Governor O'Malley birthed a new era of policing Baltimore City by setting into motion his "own radical brand of broken-windows policing by mixing the most aggressive elements of the New York City and Chicago strategies."[26] Despite alternative methods of reducing serious crime in Baltimore City, Governor O'Malley "stacked [his] efforts on a distorted and unconstitutional application of the [Broken Windows] theory…combining an extraordinary aggressive arrest policy with a target on disadvantaged neighborhoods."[27] And the Baltimore City Council agreed with this assessment, stating that the "…consequence" of vigorous policing in Baltimore City is "the disproportionate arrest of both African Americans and the poor."[28]

Governor O'Malley had the Police Officers retrained. According to Assistant U.S. Attorney A. David Copperthite, this training, at least in part conducted by Mayor Giuliani's New York City Police Department, led Police Officers to "prey upon the very people they were sworn to protect."[29] One example of how unconstitutional Governor O'Malley's training regime was came to light during the criminal trial of Police Officers William King and Antonio Murray, who were both subjected to a lengthy investigation by the Federal Bureau of Investigation.[30] Pursuant to their training, conducted by members of the New York City Police Department, the Police Officers would "catch and release" drug dealers, robbing them of their money and drugs.[31] Then, Police Officers would illegally sell the drugs at a discount to distributors who, in turn, resold the drugs on the street, never recording the transactions.[32] Former P.C. Frederick Bealefeld testified that "the [BCPD's]  General Orders formed the bedrock of the [Police Officers'] conduct and could not be compromised."[33] However, the trial testimony reflects that William King and Antonio Murray were "undercover officers simply doing their job – a demanding one that required them to bend the rules and adopt new, aggressive tactics, some taught by policing experts from New York City."[34] Officer King defended his drug enforcement strategy, claiming that it was condoned

---

[26] Reed Collins, *Strolling While Poor: How Broken Windows Policing Created a New Crime in Baltimore*, 14 Geo. J. Poverty Law & Pol'y 419, 421 (2007).
[27] *Id.*
[28] Balt. City Council Pub. Safety Sub Comm., *Report on the Police Performance Enhancement Program and Recommendations to Improve the Process of Expungement of Arrest When No Charges Are Filed*, 12, Addendum II (September 2005).
[29] Matthew Dolan, *Two City Police Officers Accused in Robbery, Extortion of Drug Suspects,* The Bat. Sun, March 15, 2006.
[30] *Id.*
[31] Matthew Dolan, *Addict-Turned-Informant Testifies He Resold Drugs Confiscated by Police*, The Balt. Sun, March 21, 2006.
[32] *Id.*
[33] Dolan, *supra*, at note 31.
[34] *Id.*

by the rank and file.[35] In fact, Officer King agreed that he may have broken BCPD rules and regulations, but that it was an "acceptable procedure," which had been approved within the BCPD under P.C. Clark, who was under the direct control of Governor O'Malley.

> We was [sic] taught how to sell drugs by the New York City cops who were training members of the Baltimore City Police Department in more proactive policing that had helped bring down crime rates in their hometown during the 1990s.[36]

Governor O'Malley instructed the Police Officers, by and through the rank and file, to 'clean up the streets.' And that they did. According to Councilman James Kraft of Baltimore City's First District, when "upstanding citizens" complain about "drug dealing and other activities," the "City police officers arrest the men on the corner. They arrest everyone on the street, and all the people sitting on the stoops."[37] Because, Governor O'Malley and his subordinates believed that Baltimore City was interested in "just getting those people off the streets," the police would look for drugs and, if they didn't find any, they would "charge the arrestees with loitering or failure to obey a police officer."[38]

Former State's Attorney Patricia Jessamy commented at a legislative hearing in 2006 that "City police increasingly arrest people for crimes without probable cause."[39] She explained that she "took an oath to see that justice be done" and that she will not be a party to "tram[ing] on the Constitution."[40] Governor O'Malley's responded to Patricia Jessamy's commentary by suggesting that the legislature take away her power to determine which arrests are proper.[41]

Going back in time, Governor O'Malley noted in his 1999 campaign for Mayor that "[officers] are only human" and "when [they] are encouraged to be more assertive, government must police the police."[42] Despite Governor O'Malley's warning about Police Officers' misconduct and CompStat's geographic tracking of performance, the policing of the police never happened. In fact, according to the former chief or the BCPD's Internal Disciplinary System, Joann Branche, in the rare instances that Police Officers were investigated, "there were back-door deals in punishment. There were instances where

---

[35] *Id.*

[36] Ethan Brown, *Snitch: informants, cooperators & the corruption of justice* (2008).

[37] Ericson, Jr., *Copping Out,* Balt. City Paper, Oct. 5, 2005.

[38] *Id.*

[39] Edward Ericson, Jr., *City State's Attorney Patricia Jessamy Asserts At Hearing That Police Arrest Tactics Are Unconstitutional*, Balt. City Paper, http://www2.citypaper.com/news/story.asp?id=11331 (last visited April 17, 2011).

[40] *Id.*

[41] *Id.*

[42] O'Malley, *supra,* at 22.

recommendations for punishment were not followed. There were cases that should be punished that were dismissed."[43] She further added that "the [Police] Department is not capable of policing itself."[44]

Governor O'Malley could not have been clearer than he was in his green booklet when he stated that if the Mayor truly wants to root out police corruption and misconduct, they will permit a citizen review board to have power.[45] He added that the internal investigation process must be opened to the public to assure the public that police problems are not being swept under the rug.[46] It would surprise very few people to know that to date the citizen review board in Baltimore City only has the power to make recommendations and that internal investigations are not by any means open to the public.

As the saying goes, small things grow in the right contextual soil. Borrowing from the theories of broken-windows policing, as advocated by Governor O'Malley, the project of moving toward order rests on a premise that smaller units of disorder, left alone, undisturbed, or even worse condoned, will generate big negative effects."[47] "Trivial to some, these instances of disorder send a larger signal that no one cares."[48] "Miscreants feel at least empowered, and perhaps inspired, to make trouble when they see signs of disorder."[49] Because breaking windows "has always been fun" communities that want to foster order need the deterrence message that intact windows deliver.[50] Applying these principals to Governor O'Malley's police department and the massive number of Fourth Amendment violations that occurred every day, civil rights violations that appear to some to be trivial are comparable to broken windows. Both may be deemed destructive, and thus, intolerable; just as a broken window might deserve the attention of law enforcement efforts, civil rights violations of comparatively small size also warranted Governor O'Malley's repair. Under Governor O'Malley's reign, however, they were not even given so much as a quick fix.

Instead, what Police Officers got were formal and informal quotas designed to increase the arrest numbers even more. In doing so, the quotas rewarded officers irrespective of whether there was probable cause to make an arrest or not, i.e. quantity not quality. One such system was reported in the Baltimore Sun on March 29, 2005, providing in pertinent part:

> All patrol officers…were required to tally their enforcement statistics -
> from parking citations to felony arrest. The officer's numbers are
> compared with averages from their squads and shifts. [This last Sunday]
> the program was enforced…the 27 lowest performing officers – three

---

[43] *Former City Official: Police Dept. Full of Corruption*, http://www.wbaltv.com/news/19931461/detail.html (last visited April 17, 2011).
[44] *Id.*
[45] *O'Malley, supra, at 22.*
[46] *Id.*
[47] *Atlantic Monthly, supra,* at 31.
[48] *Id.*
[49] *Id.*
[50] *Id.*

from each district were reassigned, at least temporarily…Yesterday, the Union called it 'punishment…it is totally destructive.'

In the Northern District, an internal memorandum was intercepted stating that:

You have officers competing with each other, officers worrying about their arrest numbers. There's going to be pressure to make arrests arbitrarily just get your numbers up.[51]

The sad reality of what Governor O'Malley did to Baltimore City and the BCPD was exemplified on September 27, 2008, when it came to light that in numerous sexual assault and burglary cases, "Baltimore police detectives instructed crime lab technicians not to follow up on DNA found on evidence at crime scenes." It is believed that the instructions were given to technicians in an effort to hide the fact that the wrong person had been arrested. And that is broken-windows policing at its finest - a system designed to deter crime broken in a manner that increased crime by the very people that are charged with preventing crime.

There is no dispute that Governor O'Malley was elected Mayor by promising the impossible - to "turn Baltimore City around by making it a safer place."[52] As communicated in more detail above, he "chang[ed] the way we police and reform[ed] the way our criminal justice system operates" by "using the power of the [Mayor's] Office."[53] And he knew he could, declaring that "[O]nly the Mayor…has the power to actually order the change in enforcement priorities and thereby force reforms on a reluctant system."[54] So, he fired the P.C. from the previous administration and installed a new P.C., and together they had the Police Officers retrained by members of the New York City Police Department. When Governor O'Malley was challenged for "tram[ing] on the Constitution," he responded by attempted to usurp the State's Attorney's Office's power to determine which arrests were proper.[55] Thus, there should also no dispute that Governor O'Malley demonstrated just how much power the Mayor has over the BCPD and the Police Officers. The power the Mayor has over the BCPD and the Police Officers is no different today than it was during Governor O'Malley's administration. The hope, however, is that subsequent Mayors will continue to take the good from Governor O'Malley's reign over the BCPD and the Police Officers and harness the same courage Governor O'Malley had when he became Mayor and use it to continue to clean up the mess that Governor O'Malley left in the BCPD when he headed to Annapolis.

---

[51] *Id.*
[52] *WITH CHANGE THERE IS HOPE, supra,* at 3.
[53] *Id.* at 5, 12.
[54] *Id.* at 15.
[55] Edward Ericson, Jr., *City State's Attorney Patricia Jessamy Asserts At Hearing That Police Arrest Tactics Are Unconstitutional*, Balt. City Paper, http://www2.citypaper.com/news/story.asp?id=11331 (last visited April 17, 2011).

For these reasons and the reasons set forth more fully in the body if this Memorandum of Law, the Defendant's Motion to Dismiss should be denied in its entirety and the Opinion of this Court should be published to correct the confusion in *Anderson* and its limited progeny.

### LEGAL STANDARD FOR GRANT OF THE DEFENDANT'S MOTION

In ruling on a motion to dismiss, the court must accept the allegations of the complaint as true and dismiss defendants only if "it appears beyond doubt that the plaintiff can prove no set of facts to support the allegations."[56] "[B]efore the reception of any evidence either by affidavit or admissions, the court's task is a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support their claims."[57]

In an action for relief pursuant to 42 U.S.C. § 1983, to survive a defendant's motion to dismiss, the plaintiff need only provide "a short and plain statement of the claim showing that [he] is entitled to relief."[58] This Court may dismiss a plaintiff's complaint only if it is clear that no relief could be granted under any set of facts which could be proved consistent with the stated allegations.[59]

More specifically, Federal Rule of Civil Procedure 8 merely requires "notice pleading."[60] Though at times various courts have attempted to apply a higher standard, the Fourth Circuit has time and time again reiterated the notice pleading standard:

> In our post- *Swierkiewicz* case law, we have hewed closely to the Supreme Court's instruction that 'all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiffs' claim is and the grounds upon which it rests.' [Quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957).
>
> [A] complaint meets Rule 8's requirements if, in light of the nature of the action, the complaint sufficiently alleges each element of the cause of action so as to inform the opposing party of the claim and its general basis.
>
> [T]he sufficiency of a complaint does not depend on whether it provides enough information to enable the defendant 'to prepare a defense,' but merely 'whether the document's allegations are detailed and informative enough to enable the defendant to respond.' [Quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 3d*, § 1215 at 193.][61]

---

[56] *Richmond, F'burg & Pot. RR Co. v. Forst*, 4 F.3d 244 (4th Cir. 1993).

[57] *Sheuer v. Rhodes,* 416 U.C. 232, 236 (1974).

[58] *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *see also, Swierkiewicz v. Sorem*am 534 U.S. 506, 512 (2002)("Complaints in [§ 1983] cases, as in most others, must satisfy only the simple requirements of Rule 8(a).").

[59] *Haines v. Kerner*, 404 U.S. 579 (1972).

[60] *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160 (1993); *Swierkiewicz v. Soreman NAS*, 534 U.S. 506, 512, 122 S.Ct. 192 (2002).

[61] *Chao v. Wood, Inc.*, 415 F.3d 342, 347-9 (4th Cir. 2005).

To the extent that it can be argued that this case presents a theory of liability against the Defendants that has not been fully tested, it should not be tested on the pleadings, but instead after sufficient development of the record.[62]

The Defendants seek to dismiss the Plaintiff's Complaint. As the Defendants are well aware, such relief is a drastic and extreme result. Further, dismissal with prejudice is appropriate only if the complaint does not outline a viable claim.[63] Moreover, a motion to dismiss claims of civil rights violations may only be denied when the legal standard is carefully applied and it is shown beyond doubt that a plaintiff can prove no set of facts in support of their claims that would entitle them to relief.[64]

Under the Federal Court's general approach to pleadings, the Plaintiff can prove facts to support the allegations in his Complaint and dismissal with prejudice is not appropriate. However, in the interest of justice and proceeding in an appropriate manner with litigation, in the unlikely event that this Court finds that dismissal is warranted, the Plaintiff should have the opportunity to correct any defects in his Complaint with amendments, which would relate back to his Complaint.[65]

For these reasons and the reasons set forth more fully in the body if this Memorandum of Law, the Defendant's Motion to Dismiss should be denied in its entirety and the Opinion of this Court should be published to correct the confusion in *Anderson* and its limited progeny.

---

[62] *See Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985) and *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) ("the court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories are explored and assayed in the light of actual facts rather than a pleader's suppositions") (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure:* Civil § 1357); *Kirksey v. R.J. Reynolds*, 168 F.3d 1039, 1040-1 (7th Cir. 1999) ("a claim should not be dismissed out of hand just because it is so novel that it cannot be fitted into an existing legal category"); *Baker v. Cuomo*, 58 F.3d 814 (2nd Cir. 1995), vacated and reversed on other grounds, 85 F.3d 919; *Santara Va. Beach Gen. Hosp. v. LeBeau*. 182 F.Supp.2d 518 (E.D. Va. 2002); *Logiodice v. Trustees of Maine Centr. Inst.*,135 F.Supp.2d 199, 205-6 (D. Me. 2001); *Wadja v. R.J. Reynolds Tobacco Co.*, 103 F.Supp.2d 29, 36 (D. Mass. 2000); *Official Comm. Of Unsecured Creditors of Buckhead Amm. Corp. v. Reliance Capital Group. Inc.*, 178 B.R. 956, 961 (D. Del. 1994); *JES Props. Inc. v. USA Equestrian. Inc.*, 2003 U.S. Dist. LEXIS 20633, *26-27 (M.D. Fl. 2003); *Mayes v. Office Depot. Inc.*, 2002 U.S. Dist. LEXIS 27063, *8 (W.D. La. 2002).
[63] *Sutliff, Inc. v. Donovan Companies, Inc.*, 727 F.2d 648 (7th Cir. 1984).
[64] *Alie v. NYNEX Corp.*, 158 F.R.D. 239 (E.D.N.Y. 1994).
[65] *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2nd Cir. 1988) (dismissal for failure to meet pleading requirements ordinarily should be accompanied by leave to file an amended complaint); *Washington v. T.G.&Y. Stores Co.*, 324 F.Supp. 849 (W.D.La. 1971) (allowing amended complaint to correct a misnomer); and *Stith v. Manor Baking Co.*, 418 F.Supp. 150, 156-157 (W.D.Mo. 1976) (if allegations are not sufficient, "complaint is dismissed without prejudice to amend").

## ARGUMENT

I.  **THE MAYOR & CITY COUNCIL WEILD SUFFICENT CONTROL OVER THE BALTIMORE CITY POLICE DEPARTMENT TO BE SUBJECT TO LIABILITY FOR THE DEFENDANT POLICE OFFICERS' ACTIONS.**

Despite the Defendant's citation to cases addressing other areas of the law, it is well-established that the Mayor & City Council is a proper defendant in cases alleging deprivation of constitutional rights under 42 U.S.C. § 1983. As explained by the Maryland Court of Appeals, "with regard to federal law liability under 42 U.S.C. § 1983, the state law classification of the Baltimore City Police Department [as a state agency] would not be decisive, and the Baltimore City Police Department might well be regarded as a local government agency."[66]

In fact, The Maryland Court of Special Appeals rejected an argument by a BCPD P.C. that, as an agent of the State, he was entitled to immunity from suit under § 1983.[67] In deciding that the P.C. was amenable to suit under § 1983, the Court relied upon the opinion by the United States Court of Appeals for the Fourth Circuit in *Wiley v. Mayor and City Council of Baltimore*.[68] In *Wiley*, a group of police officers sued various individuals and entities, including the Mayor & City Council, for alleged constitutional violations arising out of compulsory polygraph examinations. Dismissal was sought on the same grounds pressed here -- "that they cannot be held liable for this policy because the Department is formally an agency of the State of Maryland and, in fact, is legally insulated from the jurisdiction of City officials."[69] Although it declined to directly address the issue, the Fourth Circuit cited with approval two prior decisions by the United States District Court for the District of Maryland, which rejected the very same argument by the Mayor & City Council.[70] After a detailed factual analysis of the interaction between the Mayor & City Council and the BCPD, the Court in *Wilcher v. Curley* concluded:

> While the Department and the Commissioner are hybrid creatures, the City exercises such substantial control over the day-to-day activities and policies of the Department that if there was something major amiss in the Department in the time period involved in these cases the City and/or the Commissioner either would or should have known about it, and would or should have taken steps toward cure of the same.[71]

---

[66] *Clea v. Mayor and City Council of Baltimore*, 312 Md. 662, 670 n.5, 541 A.2d 1303, 1307 n.5 (1988).

[67] *Blades v. Woods*, 667 A.2d 917, 919, 107 Md. App. 178, 181-82 (1995).

[68] 48 F.3d 773 (4th Cir. 1995).

[69] *Id.* at 776.

[70] *See Id.* (citing *Hector v. Weglein*, 558 F. Supp. 194, 197-99 (D. Md. 1982); *Wilcher v. Curley*, 519 F. Supp. 1, 3-4 (D. Md. 1980)).

[71] 519 F. Supp. at 4-5.

This Court in *Hector v. Weglein* reached a similar conclusion, based upon the same facts present in *Wilcher*, as well as two additional facts found to be very important, first, that the Mayor appoints the P.C., and second, that a Baltimore City board had the power to review complaints brought by the public about Police Officer's misconduct.[72] The Court concluded that these two facts "add up to sufficient City involvement in and knowledge of the affairs of the Department and the actions of the Commissioner, as well as sufficient power to affect the same if serious abuses are occurring," such that dismissal of the § 1983 claims against the Mayor & City Council were denied.

This Court again addressed these same arguments in *Mason v. Mayor and City Council of Baltimore*, and again rejected the Mayor & City Council's contentions.[73] The Court "conclude[d] that the City maintains sufficient practical knowledge of and control over the Police Department to withstand dismissal of this § 1983 action."[74] As here, the Mayor & City Council in *Mason* argued that the Complaint failed to state a claim. The court rejected that assertion as well, noting that the Complaint had alleged:

> [An] injury resulting from a government policy of inadequate training or supervision that amounts to deliberate indifference to the rights of" the plaintiff, and that such allegations were sufficient to withstand a motion to dismiss under "the liberal system of 'notice pleading' " and in light of § 1983 cases including *Canton, Monell, Spell, Tuttle,* and others.[75]

And the above makes sense, despite the BCPD's status as an agency of the State of Maryland, because the city in which the BCPD serves, namely Baltimore City, nonetheless exercises a tremendous amount of control over the BCPD. This control can be exhibited through the inherent relationship that the Mayor & City Council have with the P.C., making any agency relationship that the State of Maryland has with the BCPD appear to be more in name and less in actions.

In fact, the Mayor is cloaked with the authority of conservator of the peace.[76] One of the ways in which the Mayor's policing power is exercised is through the appointment by the Mayor of the P.C., who must also be subject to confirmation by the a majority vote of the City Council.[77] The P.C. serves at the

---

[72] 558 F. Supp. at 199.

[73] 1995 WL 168037 (D. Md. 1995) (unreported).

[74] *Id*. at *4.

[75] See *Mason*, 1995 WL 168037 at *4-5 (citing *Canton*, 489 U.S. 378; *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985); *Monell v. Department of Social Servs.,* 436 U.S. 658, 690 (1978); *Spell v. McDaniel*, 824 F.2d 1380, 1385-86 (4th Cir. 1987)).

[76] . *City of Baltimore v. Silver*, 283 A.2d 788, 263 Md. 439, appeal dismissed 93 S.Ct. 38, 409 U.S. 810, 34 L.Ed2d 65 (1971), see also *Mayor, etc., of Hagerstown v. Dechert*, 32 Md. 369 (1870) ("The Constitution, while depriving the Mayor of his [or her] judicial powers as a justice of the peace, did not deprive him of his police powers as a conservator of the peace ...").

[77] *See* Baltimore City Public Local Laws § 16-5 (a).

pleasure of the Mayor, is paid a salary by Baltimore City, and is subject to termination by the Mayor.[78] Therefore, as the local laws of Baltimore City indicate, although the BCPD may technically be an arm of the State of Maryland, not every aspect of the BCPD is completely beholden to the State of Maryland. In the case of Baltimore City's relationship with the P.C., Baltimore City exercises considerable control over the BCPD, especially when the duties of the P.C. are taken into account.

The affairs and operations of the BCPD are supervised and directed by the P.C., who functions as the Chief of Police and executive officer of the BCPD who, on behalf of the Mayor, manages the BCPD and the Police Officers, including the Defendant Police Officers to this action.[79] The P.C., on behalf of the Mayor, exercises the police power of Baltimore City, entrusting in him the duty to enforce all laws and ordinances of Baltimore City, which may also be equally enforced by subordinate members of the BCPD.[80] Because the P.C. is appointed by the Mayor, confirmed by a majority of City Council members, is paid a salary by Baltimore City, and serves at the pleasure of the Mayor, the connection between Baltimore City and the BCPD cannot be overlooked by considering the latter as a complete arm of the State of Maryland.

For these reasons and the reasons set forth more fully in the body if this Memorandum of Law, the Defendant's Motion to Dismiss should be denied in its entirety and the Opinion of this Court should be published to correct the confusion in *Anderson* and its limited progeny.

## II.   THE MAYOR & CITY COUNCIL'S PRIMARY RELIANCE ON *ANDERSON V. STROHMAN* AND ITS LIMITED PROGENY IS DANGEROUSLY MISPLACED.

The holding in *Anderson* fundamentally misstates the well-settled constitutional law governing the Mayor & City Council's viability to a *Monell* claim. The Plaintiff agrees with *Anderson* that "Section 1983 allows individuals to sue any person who violates their constitutional rights while acting under the color of law."[81] The Plaintiff also agrees with *Anderson* that "*Monell* allows plaintiffs to sue the City under § 1983 for the unconstitutional conduct of its employees."[82] That is, however, where the agreement ends and the disagreement begins. *Anderson* concludes that "the threshold question becomes whether Baltimore police officers are City employees" and analyzes whether Police Officers are employed by the Defendant or the State of Maryland.[83] The problem with *Anderson* is that a *Monell* claim does not redress the actions or inactions of police officers, but rather the actions and inactions of municipal employees that could have prevented the claimed violations to a plaintiff's constitutional rights. In Baltimore City, the

---

[78] *See* Baltimore City Public Local Laws § 16-5 (b).
[79] *See* Baltimore City Public Local Laws § 16-4.
[80] *Roddy v. Finnegan*, 43 Md. 490 (1876).
[81] 6 F.3d at 644.
[82] *Id.*
[83] *Id.*

Mayor & City Council and their subordinate employees are the "employees" at issue in a *Monell* claim and, as such, the employment of the Police Officers and their employer are not at issue and never have been.

Further, the cases cited in *Anderson* do not speak at all to the the viability of a lawsuit based upon the facts of the Plaintiff's case against the Defendant. For example, *Chin v. City of Baltimore* is cited in *Anderson* in support of the proposition that "the Baltimore City government does not wield enough control over the Baltimore Police Department to be subjected to liability for the Baltimore Police Department's actions."[84] The claim against Baltimore City in *Chin*, however, was based upon *respondeat superior* liability. In this context, the Court concluded that the BCPD is a state agency and that Baltimore City "cannot be subject to liability for the Baltimore Police Department's actions."[85] The instant case is clearly distinguishable from *Chin* because the Plaintiff in the instant case is not in any way basing his claim against the City on *respondeat superior* liability, but rather has asserted a *Monell* claim against the Mayor & City Council that arises out of their acts and omissions and those of their subordinates. *Chin* is also distinguishable from the instant case because, as is pointed out in *Humbert v. O'Malley,* "The Court in *Chin* dismissed the plaintiff's claim by relying on *Carter*…and by finding that the plaintiff had failed to allege sufficient facts to establish a custom or policy to deny the plaintiff's constitutional rights."[86]

*Anderson* also heavily relies on *Clea v. City of Baltimore*, a state law opinion, for the proposition that "[a]s a matter of Maryland law, Baltimore City is simply not the officers' employer for tort liability purposes."[87] *Clea* reached this conclusion primarily by relying upon the oft-cited statutory law stating that the General Assembly made the BCPD a state agency.[88] As *Wilcher, supra,* explained, such a designation in and of itself "is not in itself determinative of whether the Department is a city or state agency for §1983 purposes since state and local law are only one of several indicators of an agency's status."[89] More significantly, *Clea* held that this determination of the BCPD as a state agency pertains to claims of *respondeat superior* liability only and "would not be controlling for other purposes, such as §1983 liability," in which the Baltimore City Police Department "might well be regarded as a local government entity."[90] *Mayor & City Council of Baltimore v. Clark,* which is regarded as the counterbalance to *Clea,*

---

[84] 241 F. Supp. 2d 546, 549 (D. Md. 2003).
[85] *Id.* at 549.
[86] *See Humbert* at n. 16.
[87] 312 Md. 662, 668 (1988).
[88] *Id.* at 669.
[89] *Wicher* at 4.
[90] *Id.* at 669-670, n. 5; see also, *Humbert*, *supra* at n. 16, in which the Court cited *Clea* in support of its conclusion that the City has strong practical links to the Baltimore City Police Department for §1983 purposes.

was not cited in *Anderson,* but had it been, it likely would have provided the following guidance from the Maryland Court of Appeals:

> But it is also true, as a matter of now long-standing practice, that the State undertakes virtually no oversight or supervision of the Police Department. This is not a criticism of the State. The disappearance of oversight by the State became an essentially unavoidable reality after (1) in 1966, the City became the agency of government responsible for appropriating money for the operation of the police department, see *Mayor & City Council v. Silver*, 263 Md. 439, 450-51 (1971); and (2) in 1976, the Mayor became responsible for appointing the Police Commissioner, see *Clea*, 312 Md. at 669. ***What remained, particularly after 1976, was an institutional configuration in which only city government could effectively and meaningfully oversee the Police Department.***[91]

Moreover, *Creasy v. Mayor of Balt.,* also cited in *Anderson*, is not controlling precedent for the instant case for two reasons. First, in *Creasy,* the Court's determination that the BCPD is an agency of the State, not Baltimore City, was based upon its reliance on §16-2(a) of the Public Local Laws and *Chin.* Section §16-2(a) is not dispositive of the control issue and *Chin* is distinguishable from the instant case. Second, the Court found that the plaintiff in *Creasy* "pointed to no action or inaction on the part of the Mayor of Baltimore City or the Commissioner that resulted in a constitutional injury…."[92]

*Brown v. BPD* is an employment case cited in *Anderson.* As in other cases cited *supra*, the driving force behind the Court's decisions in *Brown* is the *Clea/Chin* conclusion that Baltimore City does not wield enough control over the Baltimore City Police Department.[93] *Clea* and *Chin*, as argued *supra*, are distinguishable from the instant case.

For these reasons and the reasons set forth more fully in the body if this Memorandum of Law, the Defendant's Motion to Dismiss should be denied in its entirety and the Opinion of this Court should be published to correct the confusion in *Anderson* and its limited progeny.

## III.    PLAUSIBILITY OF THE PLAINTIFF'S CLAIMS AGAINST THE MAYOR & CITY COUNCIL OF BALTIMORE.

As argued above, for purposes of *Monell* liability, because of its strong practical links to the BCPD and the Police Officers, it is virtually axiomatic that Baltimore City may be held accountable for the BCPD's policies.[94] Under *Monell*, a municipality is liable under §1983 when the "municipality itself

---

[91] 944 A.2d 1122, 1127 (emphasis added).
[92] *Id.* **5-6.
[93] 2011 U.S. Dist. LEXIS 147219 (D. MD. Dec. 21, 2011) (unpublished).
[94] See *Wiley v. Mayor & City Council*, 48 F. 3d 773, 775 (4th Cir. 1995).

causes a constitutional violation...”[95] The municipality can also be held liable if it causes a deprivation of constitutional rights through an official policy or custom.[96] “Official policy” in the relatively narrow sense of discrete, consciously chosen courses of action by “policymakers” is not the only basis for imposing municipal liability, however.[97] “Custom, or usage,” in the exact language of § 1983, may also serve.[98] And the existence of such a “custom or usage” may be found in “persistent and widespread . . . practices of [municipal] officials [which] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law.”[99] In the case at bar, the Defendant contends that the Plaintiff’s Complaint points to no Baltimore City policy that caused his injuries. This contention is nothing short of inaccurate.

The Defendant concedes that “the Complaint...describes the policies, practices, procedures or customs…that could have plausibly caused constitutional injury to the Plaintiff.”[100,101] The Defendant, however, persists in banging the tired notion that Baltimore City “is legally prohibited from even trying to control the BPD’s policies.”[102] As discussed is depth above, not only is the Defendant legally able to control the BCPD and the Police Officers, but the Plaintiff has gone to great lengths to detail numerous recent examples from Governor O’Malley’s administration where he not only declared that the Mayor was the only one who could control the BCPD and the Police Officers, but also, for better or worse, demonstrated that, if fact, the Mayor was in control, even if he wanted to order unconstitutional arrests “just get people off the streets.”[103]

---

[95] *Monell v. New York Department of Social Services,* 436 U.S. 658, 694 (1978).

[96] *Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999).*

[97] *Spell v. McDaniel,* 824 F.2d 1380, 1386-87 (4th Cir. 1987).

[98] *Monell,* 436 U.S. at 690-91.

[99] *Spell*, 824 F.2d 1380 at 1387.

[100] Defendant’s Motion to Dismiss at pg. 15.

[101] The Plaintiff’s Complaint is unmistakably clear in Count One of his Complaint that at all times pertinent, Baltimore City had policies, customs, and/or patterns and practices of failing to properly discipline , train, and supervise its police officers, including those that are named in this action, in the proper way to conduct investigations, disclose *Brady* materials, and how to collect evidence. To wit, Baltimore City failed to ensure that the Police Officers would conduct constitutionally adequate investigations; obtain probable cause to ensure that suspects would not be falsely arrested and imprisoned; follow the duties imposed by *Brady v. Maryland*; and to never fabricate inculpatory evidence against suspects. The Complaint is likewise unmistakably clear that the final policymakers had actual or constructive knowledge of these unconstitutional practices, yet failed to take any reasonable or adequate steps to remedy them. And the Complaint is also unmistakably clear that at all times pertinent, Baltimore City had policies, customs, and/or patterns and practices of failing to properly discipline, train, and supervise Police Officers, including those that are named in this action, in the proper way to conduct investigations, disclose *Brady* materials, and collect evidence.

[102] *Id.*

[103] Ericson, Jr., *Copping Out,* Balt. City Paper, Oct. 5, 2005.

For these reasons and the reasons set forth more fully in the body if this Memorandum of Law, the Defendant's Motion to Dismiss should be denied in its entirety and the Opinion of this Court should be published to correct the confusion in *Anderson* and its limited progeny.

***CONCLUSION***

In the Fourth Circuit, it is well-established law that when ruling on a motion to dismiss, the trial court must decide whether the complaint states a claim, assuming the truth of all well-pleaded facts in the complaint and taking all inferences from those facts in the light most favorable to plaintiff. Dismissal is proper only if the facts and allegations would fail to afford the plaintiff relief if proven. For these reasons and the reasons set forth more fully in the body if this Memorandum of Law, the Defendant's Motion to Dismiss should be denied in its entirety and the Opinion of this Court should be published to correct the confusion in *Anderson* and its limited progeny.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, P.C.**

*Charles H. Edwards IV*

_____
Charles H. Edwards IV
Law Offices of Barry R. Glazer
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
(410) 547-8568
Bar Roll No.: 29977
*Attorney for Plaintiff*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, this 17th Day of December, 2014, I electronically filed with this Honorable Court a copy of the Plaintiff's Opposition to the Defendants' Motion to Dismiss. All parties to this action have been alerted to this filing either by the Court's electronic filing system or through United States Postal Service, First Class Mail, postage prepaid.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, P.C.**

*Charles H. Edwards IV*

_____

Charles H. Edwards IV
Law Offices of Barry R. Glazer
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
(410) 547-8568
Bar Roll No.: 29977
*Attorney for Plaintiff*